**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | | **CIVIL ACTION** |
| **JOHN DOE 6** | : | |
| **c/o Janet, Jenner & Suggs, LLC** | : | |
| **1777 Reisterstown Road** | : | |
| **Commerce Center East, Suite 165** | : | |
| **Baltimore, Maryland 21208** | : | |
| | : | **No.** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **The Pennsylvania State University** | : | **JURY TRIAL DEMANDED** |
| **201 Old Main** | : | |
| **University Park, PA 16802** | : | |
| | : | |
| | : | |
| **and** | : | |
| | : | |
| **The Second Mile** | : | |
| **1402 South Atherton St.** | : | |
| **State College, PA 16081** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Gerald Sandusky** | : | |
| **130 Grandview Road** | : | |
| **State College, PA 16801-7011,** | : | |
| **Individually and in his official capacity for** | : | |
| **The Second Mile,** | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFF'S COMPLAINT

Plaintiff, for his causes of action against Defendants alleges the following:

### PARTIES

1.      Defendant Gerald Sandusky ("Sandusky"), also known as Jerry Sandusky, is a

convicted pedophile.    He is an adult citizen and a resident of the Commonwealth of

Pennsylvania domiciled at 130 Grandview Road, State College, Pennsylvania 16801-7011. Sandusky is being sued individually and in his capacity as an authorized, agent, servant, and/or employee of his two co-Defendants.

2.      Defendant The Pennsylvania State University ("Penn State or PSU") is a private/public organization established by and operated by the Commonwealth of Pennsylvania, with its principal place of business at 201 Old Main, University Park, Pennsylvania 16802.  It operates on an annual budget in excess of $4.5 billion and has an endowment of nearly $2.0 billion.  Penn State conducts business in the Commonwealth of Pennsylvania.

3.      PSU is one of four public universities within the Commonwealth of Pennsylvania's System of Higher Education.  In 1989, the Pennsylvania Legislature designated the University as a "state-related" institution that receives some state appropriated funding but remains autonomous and free from the State's direct control.

4.      At all times material hereto, PSU acted by and through its authorized agents, servants and employees, including without limitation Gerald Sandusky ("Sandusky"), a former defensive coordinator/coach for PSU's Division I football team, all of whom acted within the full course and scope of the authority vested in them by PSU.

5.      At all times relevant, Defendant The Second Mile ("Second Mile") was and continues to be a non-profit organization authorized to conduct business in the Commonwealth of Pennsylvania with its principal place of business located at 1402 Atherton Street, State College, Pennsylvania 16801.  Since the time of its inception Second Mile has conducted and continues to conduct its operations throughout the Commonwealth of Pennsylvania.  Sandusky was the founder of Second Mile, and at all times relevant acted as a principal and/or agent,

servant, and/or employee of Second Mile and within the scope of authority conferred upon him by Second Mile.

6.      Plaintiff, John Doe 6, is an adult male individual, formerly a citizen and resident of the Commonwealth of Pennsylvania and presently a citizen and resident of a state other than Pennsylvania. The identity of this Plaintiff is not disclosed in this Complaint in order to protect the identity of the Plaintiff because the Plaintiff was a victim of sex crimes when Plaintiff was a minor. The identity of the Plaintiff will be made known to the Defendants by separate communication.

## JURISDICTION AND VENUE

7.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the Plaintiff herein, a citizen of a state other than the Pennsylvania, is diverse in state citizenship from Defendants, citizens of the state of Pennsylvania.

8.      This Court has personal jurisdiction over the Defendants because both Penn State and Second Mile regularly and continuously conduct business in this District. This Court has personal jurisdiction over Gerald Sandusky because he is a citizen and resident of the Commonwealth of Pennsylvania.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391. All Defendants are residents of the Commonwealth of Pennsylvania.    Venue is appropriate in a judicial district in which any Defendant resides, if all Defendants are residents of the State in which the District is located. Defendants Penn State and Second Mile reside in this district and all Defendants are residents of the Commonwealth of Pennsylvania.

## FACTS

10.     At all times material hereto, PSU had a paramount financial interest in protecting the reputation and commercial viability of its football program.

11.     Defendant Sandusky was an employee of Penn State University when he assaulted John Doe 6.   Defendant Sandusky began his coaching career at Penn State in 1969, and was employed by Penn State for many years, primarily as defensive coordinator of its Division I football program.   He held that position for 23 years.   During the times relevant hereto, Joseph "Joe" Paterno was head football coach of PSU, held the record for most wins by a Division I football coach, and enjoyed legendary status in the State of Pennsylvania and the nation at large.   Sandusky, as described below, traded on and exploited his status as an associate of Paterno and member of the PSU football staff to further his grooming and assaults on young boys.

12.     Defendant Penn State University granted Sandusky unfettered access to its facilities, including but not limited to its weight rooms, training rooms, offices, and showers.

13.     In 1977, Sandusky founded "The Second Mile" in State College, PA.   Second Mile began as a foster home for troubled boys and grew into a charity dedicated to helping children with absent or dysfunctional families.   Sandusky was its primary fundraiser

14.     Since its creation in 1977, Defendant Second Mile has had significant social and financial links to Penn State, Second Mile traded on Defendant Sandusky's affiliation with Penn State, its football program, and coach Joe Paterno to increase awareness for its programs and to increase participation by youth. Penn State voluntarily entered into a social and financial relationship with Defendant Second Mile and its founder, Defendant Sandusky. Penn State

has benefited from its affiliation with the Second Mile by reaping the public relations rewards of close ties to and participation with a local charitable organization.

15.    Throughout Second Mile's existence, Sandusky used it as a "hunting ground" for victims of his perverted desire to sexually abuse minor boys.

16.    At all times material hereto, PSU did not have appropriate policies and procedures to regulate its employees' usage of its facilities.    Namely, PSU permitted its employees to bring minor boys to its campus and interact on a one on one basis without supervision or parental consent.    Penn State did not have appropriate policies regulating the usage of facilities for unorganized activities or during off hours.

17.    Defendant PSU's purposeful disregard and continued and deliberate concealment of Sandusky's inappropriate conduct was a function of its recognition that the University's stature, reputation, and economic interests would be adversely affected by any public disclosure regarding the sociopathic character of an individual associated with the school's legendary and financially lucrative football program.

18.    Before May 1998, several Penn State staff members and football coaches, including but not limited to, Coach Richard Anderson, each acting as Defendant PSU's agents, servants, and/or employees, on multiple occasions observed Sandusky, an employee of Penn State at the time, inappropriately showering with young boys in the Lasch Building (now the East Area Locker Building or "Old Lasch"), yet no action was taken to investigate or put a stop to this inappropriate conduct.    The conduct that was observed should have raised suspicions that minor boys were being endangered on its premises by one of its employees. Defendant PSU failed to have in place any or adequate policies, procedures and protocols requiring employees to

bring matters of this nature to the attention of its administration, and/or failed to ensure that such policies, procedures and protocols were being followed.

19.    Beginning in May, 1998, on or about the 3rd day of that month, Sandusky engaged in indecent contact with John Doe 6, and sexually abused him as described below.  Also in 1998, but prior to his assault of John Doe 6, Sandusky had inappropriate contact with several minor children one of whom was at, or around the time of his assault, a close friend of John Doe 6. Sandusky groomed this minor victim and assaulted him on Penn State's campus.  The identity of this victim is not disclosed in this Complaint in order to protect the identity of the Plaintiff and that victim because both were victims of sex crimes when they were minors.

20.    Another adult male has alleged that he was molested by Sandusky over 100 times as a child prior to 1998.  He also said that Sandusky brought him to the Penn State football locker room showers where Sandusky fondled him and performed oral sex on him.

21.    Defendant PSU's concealment of the prior incidents, and its failure to discipline, or otherwise sanction, Sandusky, and report him to appropriate authorities, substantially contributed to Sandusky's ability to continually victimize children on Penn State property and elsewhere.

22.    Before May 1998, Defendant PSU recognized and/or should have recognized that Sandusky was using his position at the University, and the University facilities to bring minor boys to its campus including Plaintiff herein, and doing so for inappropriate and illicit purposes. The minor boys were subject to a significant risk of serious physical injury as a result of Defendant's concealment of and/or failure to disclose Sandusky's harmful contact with young boys. Penn State knew, or should have known, that Sandusky committed repeated acts of

childhood sexual abuse, as it is defined in Pa. § 5533, by having sexual intercourse, deviate sexual intercourse, and/or indecent contact with minor boys.

23.    As a direct result of Defendant PSU's failure to take reasonable and necessary precautions in light of the information available to it, Sandusky was enabled to sexually molest and assault young boys, and have indecent contact with them.  Sandusky did, in fact, sexually molest, assault, and have indecent contact with young boys, including the Plaintiff.

24.    As a further and direct result of PSU's failure to take reasonable and necessary precautions in light of the information available and/or known to it, parents of children who interacted with Sandusky were unaware of Sandusky's known history of deviant behavior with young children.

25.    Prior to the initial incident between Sandusky and John Doe 6 which occurred on PSU premises, Defendant Second Mile recognized and/or should have recognized that Sandusky was sexually victimizing minor boys for his own sexual gratification, including those that he lured onto PSU's campus by Sandusky.  Ultimately, John Doe 6 became one of those victimized boys.  He was 11 years old at the time of his encounter with Sandusky on the PSU campus.

26.    Knowing and/or having reason to know of the significant dangers posed by Sandusky, and knowing and/or having reason to know that each had affirmatively contributed materially to Sandusky's ability to exploit The Second Mile as a source of sexual prey and utilize his standing at Defendant PSU and Defendant Second Mile in order to groom and otherwise exploit the children he came in contact with through Defendant Second Mile, Defendant Second Mile owed a duty to the children participating in The Second Mile activities, and Defendant PSU owed a duty to such children, especially those children Sandusky lured onto PSU premises by

Sandusky, to protect them from Sandusky and/or to warn them and their parents of the danger he posed.

27.     Sandusky's status as a member of the Penn State football staff, and the failure of Penn State and Second Mile to report and/or disclose Sandusky's sociopathic behavior, contributed substantially to Sandusky's access to Plaintiff.

28.     Sandusky exploited his ongoing relationship with Penn State and Second Mile by deliberately, methodically, and calculatedly grooming Plaintiff for a sexual relationship.

29.     Defendant PSU's failure to restrict Sandusky's access to University facilities, and/or its failure to properly monitor Sandusky while on University premises substantially contributed to the sexual assaults and injuries sustained by Plaintiff.

30.      In April 1998, then 11-year-old John Doe 6 met Sandusky at a Second Mile event, and Sandusky wasted no time in beginning to groom Plaintiff for sexual abuse.

31.     Plaintiff, at all times alleged herein, was less than sixteen years of age, and was legally incapable of consenting to any of the sexual acts Sandusky perpetrated on him.

32.     At the time he was introduced to Sandusky, Plaintiff and his mother were unaware of the danger posed by Sandusky.

33.     As a participant in Second Mile activities, Plaintiff was among a defined, identifiable class of individuals whom Defendants PSU and Second Mile knew and/or should have known would be endangered by Sandusky.

34.     In 1998, Sandusky sexually abused John Doe 6. Sandusky's abuse was unwanted and has caused substantial harm to John Doe 6.  John Doe is presently under age 30.

35.     On or about the afternoon of May 3, 1998, Sandusky called John Doe 6's home and invited him to go to a Penn State athletic facility that evening to exercise. John Doe 6

ultimately accepted the invitation. Sandusky picked up Plaintiff at about 7:00 p.m. at his residence. His mother met Sandusky at the time. Sandusky concealed from Plaintiff's mother and Plaintiff his intention to lure Plaintiff into the showers, though this was his intention as evidenced by his pattern of conduct with similar young boys. Sandusky took him to the Lasch Building on the Penn State campus. As the central facility for Penn State football, the Lasch Building contained a number of exercise machines as well as dressing rooms, showers and Sandusky's office, which for many years was the office closest to Paterno's.   On the drive over Sandusky repeatedly and inappropriately placed his hand on Plaintiff's leg. This contact was one of Sandusky's early ploys to test Plaintiff's reaction, and was part of the grooming process.

36.     Sandusky exploited his status as a member of the PSU football staff to facilitate grooming and coercing his intended victim, John Doe 6. Among other things, Sandusky invited John Doe 6 to visit the coaches' offices and gave him a pair of Paterno's socks.

37.     Sandusky and John Doe 6 went to a coaches' locker room where Sandusky initiated grooming behavior. Among other things, Sandusky and John Doe 6 wrestled. This was initiated by Sandusky. Wrestling was merely a ruse to afford Sandusky an opportunity to put his hands on and rub his body against Plaintiff's adolescent male body for the purpose of Sandusky's sexual gratification. After wrestling, John Doe 6 changed into clothes that Sandusky provided and followed him to work out on exercise machines. When they finished exercising, Sandusky kissed his head and said, "I love you." This, too, was for the purpose of grooming Plaintiff for more advanced sexual activity and for Sandusky's sexual gratification. Sandusky and John Doe 6 then went to a  locker room where Sandusky took off his clothes, turned on the showers, and through the use of undue influence based on his stature secured Plaintiff's reluctant consent to shower. "All the boys do it," Sandusky told him. Extremely uncomfortable with

9

being naked and seeing Sandusky naked, after he entered the shower, John Doe 6 proceeded to a shower head as far away from Sandusky as possible and began to turn it on.  Although Sandusky had already achieved two of his goals by maneuvering this adolescent boy into the showers with him; namely, creating his own personal peep show and exposing his own genitals to this young boy, he was merely setting the stage for physical contact of a sexual nature. In furtherance of that plan, Sandusky directed him to a shower head closer to Sandusky, saying he had already warmed up the water for him.  While in the shower and nude, Sandusky wrapped his hands around John Doe 6's torso from behind and pressed his body, including his genitals, against Plaintiff and said, "I'm gonna squeeze your guts out." (When Sandusky was confronted at a later date by Plaintiff's mother, with police secretly hiding in another room so they could overhear the conversation, in response to a pointed question as to whether his genitals came in contact with Plaintiff, Sandusky did not deny such an occurrence.)  Also, during this shower escapade Sandusky played his self described role as "The Tickle Monster'" and used that as a pretense to put his hands over Plaintiff's adolescent body.  This and virtually all of Sandusky's conduct in connection his interaction with Plaintiff on this date was for the purpose of sexually gratifying Sandusky.  After John Doe 6 washed his body and hair, Sandusky lifted him under the pretense of wanting to "get the soap out of" the boy's hair, bringing his feet "up pretty high" near Sandusky's waist. John Doe 6's body contacted Sandusky's chest and his feet touched Sandusky's thigh. This likely brought Sandusky's genitals into contact with the boy's body.  The positioning of Sandusky and Plaintiff while Plaintiff was being lifted off the ground likely brought this young boy's genitals up to Sandusky's face.  Presently, John Doe 6 does not have any specific recollection of the remainder of his interaction with Sandusky.  The events following being lifted in this fashion have been described by Plaintiff as being "just kind of black."  The uncertainty of what caused him to have

obscured some of what he was subjected to in the shower, along with those events about which he does have a clear recollection, have caused the Plaintiff to suffer great mental anguish.

38.     After the shower escapade, Sandusky made promises to Plaintiff that included taking him to the movies and letting him sit on the PSU bench on the sidelines during a football game. While in the coach's locker room, before the shower incident, Sandusky took Plaintiff to Head Coach Joe Paterno's locker and gave Plaintiff a souvenir in the form of a pair of the coach's socks.  The gifts and promises were extended to Plaintiff for the purpose of grooming him and to keep him quiet.  Indeed, these (along with the intimidating atmosphere that was created during his repeated questioning described more fully below) influenced Plaintiff's statements to the police and others about his encounters with Sandusky on the PSU campus. Despite Sandusky's purportedly playful behavior that was accompanied by laughs on his part, the seriousness of what transpired was revealed in part in one of Plaintiff's remarks to the PSU police wherein he tried to rationalize that Sandusky could not have intended anything sexual by his conduct because he was "Married."

39.     Sandusky brought John Doe 6 home around 9:00 p.m. and left. John Doe 6 told his mother that he had showered with Sandusky.  She became suspicious that something was wrong and observed that her son was acting in a way that he did when he was upset about something.  Reluctantly, Plaintiff admitted to his mother that he had showered with Sandusky but did not reveal much more at that time.  Plaintiff did not sleep well and took another shower the next morning.

40.     The next morning, Plaintiff's mother called Alycia Chambers, Ph. D., a licensed State College psychologist, and related the previous night's events.  The psychologist told her to make a report to the authorities.  John Doe 6's initially called State College police, but was directed to the

PSU Police Department and reported the incident to a PSU employee, a PSU Police Department detective around 11:00 a.m.

41.    Around 11:30 a.m., a PSU detective interviewed John Doe 6. The interview elicited part of the story of what happened with Sandusky the previous evening, and information that his 10-year-old friend had been in a shower with Sandusky on another occasion where Sandusky had engaged in similar behavior.

42.    Later that day, Chambers met with the boy who told her about the prior day's events. Chambers made a report to the Pennsylvania child abuse line and also consulted with colleagues. Her colleagues agreed that "the incidents meet all of our definitions, based on experience and education, of a likely pedophile's pattern of building trust and gradual introduction of physical touch, within a context of a 'loving,' 'special' relationship." Chambers eventually produced a written report describing Sandusky as a likely pedophile

43.    That afternoon PSU's detective contacted a caseworker with the Centre County Children and Youth Services ("CYS") about the allegation.  However, there were several conflicts of interest with CYS's involvement in the case (e.g., CYS had various contracts with Second Mile and the Second Mile's executive director had a contract with CYS to conduct children's evaluations). In light of these conflicts, PSU allowed the Department of Public Welfare ("DPW") to participate in its investigation. DPW officials assigned a caseworker to assist PSU in its investigation.  However, despite the CYS caseworker's conflicts, he continued to inject himself into the investigation in an apparent attempt to deflect damage from Sandusky and Penn State.

44.    On May 4, 1998, PSU's detective and the CYS caseworker spoke with John Doe 6's friend about his contact with Sandusky. The friend stated that he had gone to the Penn State

campus on two occasions with Sandusky, whom he met through the Second Mile. Sandusky took him to the Lasch Building, where they wrestled and then showered together. While in the shower, Sandusky had inappropriate contact with him.

45.     Following his interview of John Doe 6's friend, PSU's detective inappropriately invited the CYS caseworker to participate in a re-interview John Doe 6.   (Gaining Plaintiff's trust in order to facilitate his ability to fully disclose the events being investigated was imperative and in accordance with accepted procedures and methodology under the circumstances. Bringing in this individual did not serve this goal.)  Moreover, in both interviews, subtle and not so subtle conduct on the part of the interviewers served to intensify Plaintiff's concern about being blamed for any trouble that might befall Sandusky as a result of the events being investigated.  Indeed, PSU police made sure that Plaintiff realized that his statements could serve to get Sandusky "in trouble" with the authorities.  The effect was to ensure Plaintiff would feel guilt and blame for any harm that might come to Sandusky, a figure that many held in high esteem.

46.     John Doe 6 was a minor, vulnerable after being molested only hours before.  The second interview should not have occurred.  The interview of John Doe 6 should not have included an unknown second person. The second interview and the introduction of an additional adult investigator created a hostile environment causing direct harm to John Doe 6.

47.     On several occasions, PSU's investigators intimidated John Doe 6 and otherwise conducted an abusive investigation.  The investigators repeatedly suggested to John Doe 6 that Sandusky didn't "deserve to be in trouble" and indicating that he was going to report John Doe 6's statements to Sandusky.  During the interview, the investigator further preyed upon John Doe 6's naïve idolization of Sandusky.

48.     The investigation itself would not have happened but for Sandusky's assault of John Doe 6 and PSU and Second Miles' failures to prevent it.   The inappropriate investigation techniques utilized by Defendant PSU's agents contributed significantly to John Doe 6's injuries.

49.     Sandusky called John Doe 6 twice on May 3, 1998 and once on May 6, 1998. Sandusky left a voicemail on May 6, 1998, inviting the boy to work out. John Doe 6 did not return the call. On May 6, 1998, PSU's detective reviewed voicemail messages and caller identification information from the home of the victim.

50.      On May 7, 1998, Chambers provided a copy of her written report to PSU's detective.

51.     Despite having a report from a licensed psychologist indicating that John Doe 6 had inappropriate contact with Sandusky, at PSU's direction, John Doe 6 was subjected to an evaluation by an unlicensed psychologist, who was a social worker and counselor.  On May 8, 1998, the unlicensed psychologist conducted an evaluation of John Doe 6.  He asked numerous questions of John Doe 6, forcing him, for the fourth time in less than a week, to relive the molestation.

52.     That unlicensed psychologist subsequently received payment from Penn State as an independent contractor at Penn State.

53.     On May 12, 1998, Sandusky called the boy again and arranged to pick him up at his house the next day. On May 13, 1998, PSU's detectives and a State College police officer went to the boy's house and hid inside. When Sandusky arrived they covertly listened in to his conversation with the boy's mother. The PSU detective overheard Sandusky say he had gone to the boy's baseball game the night before but found the game had been cancelled.  Sandusky acknowledged having physical contact with the boy.   The boy's mother told Sandusky that her

14

son had been acting "different" since they had been together on May 3, 1998 and asked Sandusky if anything had happened that day. Sandusky replied, "We worked out. Did the boy say something happened?" Sandusky added that the boy had taken a shower, and said "maybe I worked him too hard." Sandusky also asked the boy's mother if he should leave him alone, and she said that would be best. Sandusky then apologized.

54.     On May 19, 1998, during a conversation between John Doe 6's mother and Sandusky Plaintiff's mother asked Sandusky about the bear hug in the shower, and whether his "private parts" touched the boy while they hugged. Sandusky did not deny it.  He said, "I don't think so ... maybe."  He also said he had showered with other boys before. He admitted telling the boy that he loved him. Sandusky asked to speak with her son and the mother replied that she did not feel that was a good idea as her son was confused and she did not want Sandusky to attend any of the boy's baseball games. Sandusky responded, "I understand. I was wrong. I wish I could get forgiveness. I know I won't get it from you. I wish I were dead."

55.     The law enforcement officers should have interrogated Sandusky directly after his confrontation with John Doe 6's mother yet they made the deliberate decision not to question Sandusky at this time.

56.     On June 1, 1998, PSU's investigators interviewed Sandusky. Sandusky also said that he had showered with other boys in the past. PSU's detective advised Sandusky not to shower with any child and Sandusky replied that he "wouldn't." At the conclusion of the investigation, PSU's investigator thought that Sandusky's conduct warranted criminal charges. The District Attorney, however, declined to formally charge Sandusky. The recommendation of PSU's investigator was not documented or otherwise incorporated into PSU's investigation file.

57.     As a result of the above-described investigation techniques, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, the subject of public ridicule, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

58.     As stated in the Freeh Report, a report of an investigation recently conducted by former FBI Director, Louis Freeh, at the request of Penn State, PSU's employee Schultz learned of the incident involving Sandusky and John Doe 6, by the time he attended a meeting about it at 5:00 p.m. on May 4, 1998. In documents Schultz held confidentially in his office and that had initially been concealed from the Freeh Report's Special Investigative Counsel, Schultz had handwritten notes summarizing this meeting.  Other notes written by Schultz and contemporaneous records pertaining to the matter indicate that then-University Police Department Chief Thomas Harmon regularly informed Schultz of the investigation's progress. In fact, when the case began, the Police Department Chief told the detective that he wanted to be kept updated on the case so he could "send everything up the flag pole" and advise Schultz.

59.     Schultz's confidential notes dated May 4, 1998 state: a woman reported that her "11 1/2 yr old son" who had been involved with the Second Mile was taken by "Jerry" to the football locker rooms; that taped police interview reflected "Behavior - at best inappropriate @ worst sexual improprieties;" the conduct was "At min — Poor Judgment;" that Sandusky and the child were in the shower, and Sandusky "came up behind & gave him a bear hug - said he would

squeeze guts out — all;" and that the boy's ten-year-old friend "claims same thing went on with him." He further noted that there "had to be genital contact because of size difference." The notes conclude with the words "Critical issue - contact w genitals? Assuming same experience w the second boy? Not criminal."

60.     Schultz's confidential notes also show that sometime before 9:00 a.m. on May 5, 1998, Harmon reported to Schultz that the victim had been re-interviewed and had provided additional details about the incident and demonstrated "on chair how Jerry hugged from back hands around abdomen (sic) & down to thighs - picked him up and held him at shower head - rinse soap out of ears."  The notes also state that "the mother had spoken to a psychologist who had been seeing the boy, who would call child abuse hot line & will generate an incident no - with Dept of Public Welfare;" and that the police interviewed the second boy who reported "Similar acct. Locker room. Wrestling. Kissed on head. Hugging from behind in shower.  No allegation beyond that.  Schultz's notes end with these questions: "Is this opening of Pandora's box? Other children?"

61.     By May 5, 1998, Schultz had communicated with Curley about the Sandusky incident. In an email from Curley to Schultz and Spanier at 5:24 p.m. captioned "Joe Paterno," Curley reports, "I have touched base with the coach. Keep us posted. Thanks."

62.     On May 5, 1998, Schultz also learned from the Police Chief that the Penn State University Police were "going to hold off" making any crime log entry for the Sandusky allegations. The crime log entry would have been a public record of the incident concerning Sandusky with Plaintiff.

63.     PSU's detective delayed pulling an incident number for the Sandusky investigation and did not know why the report ultimately was opened as an "Administrative Information" file.  All pages of the police report are labeled "Administrative Information."

64.     No referral of the Sandusky incident was made to the Penn State Office of Human Resources ("OHR"). Such referrals routinely were made in other cases. Penn State did not have a written policy required OHR to be notified by the campus police of incidents involving employees.

65.     As the investigation progressed, Curley made several requests to Schultz for updates. On May 13, 1998 at 2:21 p.m., Curley emailed Schultz a message captioned "Jerry" and asked, "Anything new in this department? Coach is anxious to know where it stands." Schultz forwarded Curley's note to Harmon, who provided an email update that Schultz then forwarded to Curley. The reference to Coach is believed to be Paterno.

66.     On May 18, 1998, Curley requested another update by email. Schultz responded that there was no news and that he did not expect to hear anything before the end of the week.

67.     On May 30, 1998, Curley asked for another update by email. Schultz was on vacation at the time, but responded on June 8, 1998, saying that he understood before he left for vacation that "DPW and Univ Police services were planning to meet with him. I'll see if this has happened and get back to you."

68.     Sometime between May 27 and June 1, 1998, when he learned Sandusky would not face criminal charges, Harmon called Schultz to advise him of the District Attorney's decision. On June 1, 1998, the same day as Sandusky's interview, the Police Chief sent Schultz an email describing the interview. The Police Chief reported that the DPW caseworker and PSU's detective "met discreetly" with Sandusky, and he confirmed that "he had done this with

18

other children in the past." The investigators told Sandusky there "was no criminal behavior established [and] that the matter was closed as an investigation." Sandusky was "a little emotional" and concerned as to how this incident might affect the boy.

69.     On June 9, 1998, after returning from a vacation, Schultz updated Curley and Spanier on the Sandusky interview by email. He wrote that the investigators "met with Jerry on Monday and concluded that there was no criminal behavior and the matter was closed as an investigation. He was a little emotional and expressed concern as to how this might have adversely affected the child. I think the matter has been appropriately investigated and I hope it is now behind us."

70.     Neither Harmon's nor Schultz's emails set forth, or suggest, that they planned to discuss the incident with Sandusky, to review or monitor his use of University facilities, to discuss his role at the Second Mile and his involvement in Second Mile overnight programs operated in Penn State facilities, or to consider the propriety of a continuing connection between Penn State and the Second Mile. There also was no mention of whether Sandusky should receive counseling.

71.     Further, the emails do not indicate that any officials attempted to determine whether Sandusky's conduct violated existing University policy or was reportable under The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act").

72.     Neither Spanier, Schultz, Paterno nor Curley spoke directly with Sandusky about the allegation, monitored his activities, contacted the Office of Human Resources for guidance, or took, or documented, any personnel actions concerning this incident in any official University file.

73.     Though they knew that Sandusky had been showering with children, Defendant PSU ratified his conduct by purposely avoiding questioning Sandusky about his assault of John Doe 6, taking no action to limit Sandusky's access to Penn State facilities, not alerting the police or other proper authorities, making no effort to protect children on the University's campus, influencing the investigation and the results of the investigation including characterizing the file as an administrative file, ignoring the lead investigators opinion that criminal charges against Sandusky based on his conduct in relation to Plaintiff should have been filed,  and otherwise participating in a cover up of this and other prior incidents.

74.     In 1998, the Penn State Board of Trustees did not have a process or a committee structure for receiving regular reports from University officials on risk issues such as the Sandusky investigation.  As the Freeh report concluded Schultz, Spanier, Curley, Paterno "knew about a 1998 criminal investigation of Sandusky [related to his assault of John Doe 6 and] they showed no concern about that victim….Mr. Paterno was made aware of the 1998 investigation of Sandusky, followed it closely, but failed to take any action, even though Sandusky had been a key member of his coaching staff for almost 30 years, and had an office just steps away from Mr. Paterno's.  At the very least, Mr. Paterno could have alerted the entire football staff, in order to prevent Sandusky from bringing another child into the Lasch Building. None of them even spoke to Sandusky about his conduct.  In short, nothing was done and Sandusky was allowed to continue with impunity."

75.     In 1999, Penn State informed Sandusky that he would not be offered the position of Head Football Coach when that position became available.

76.     On information and belief, Penn State did not offer Sandusky the position of Head Coach because, among other reasons, PSU knew that he had engaged in acts of sexual

20

misconduct with children and/or that his deviant sexual proclivities would be embarrassing to the University.

77.     PSU offered and provided to Sandusky generous monetary and other "retirement" incentives so as to expedite his departure from the school without disclosing to the public that a man who had been so closely associated with the University's football program habitually had inappropriate contact with minor boys.  These and other benefits were extended to Sandusky following his molestation of Plaintiff.  This conduct on PSU's part was wholly inappropriate and along with PSU's concealment of Sandusky's abuse of minors such as Plaintiff amounted to ratification of Sandusky's wrongful and illegal behavior, including that directed toward Plaintiff.

78.     Following his retirement from Penn State, and despite Penn State's knowledge of Sandusky's sexual attraction to young boys, Penn State openly promoted Sandusky to the public at large as a dependable and respected member of the Penn State community, and maintained an ongoing special public relationship with Sandusky that contributed significantly to John Doe 6's shame and emotional distress.

79.     In addition to the promise of collaboration, Penn State officials conferred upon Sandusky "emeritus status", a position that would enhance Sandusky's stature, reputation, and credibility, again contributing to John Doe 6' sense of shame and emotional distress.

80.     Defendant Second Mile actually concealed Sandusky's pattern of inappropriate contact with minor boys and misrepresented the degree of danger he posed.  Defendant Second Mile allowed Sandusky to remain in a leadership position, provided him with compensation and continued to furnish him with access to its facilities and, tragically, provided Sandusky with further access to minor boys.

81.     Sandusky sexually molested numerous victims over a span of more than 30 years, continuing after his molestation of John Doe 6. Sandusky used his status and connections with Penn State to perpetuate his criminally outrageous and depraved acts.  PSU's response to Sandusky's sexually abusive behavior to minor boys, including Plaintiff, was to cover it up and in effect reward him as described above.  Not only did this constitute a ratification of Sandusky's abusive behavior toward Plaintiff and others, it enabled him to continue to abuse children over the course of decades.

82.     The inadequate oversight, deliberate indifference, failure to report, and intentional concealment of Sandusky's actions by Penn State contributed substantially to Sandusky's ability to commit his criminally outrageous and depraved acts.

83.     Despite actual and/or constructive knowledge of the dangers that Sandusky posed to children, and in particular the dangers he posed to children who were participants in the activities of The Second Mile, PSU took no action to alert law enforcement authorities of these dangers. To the contrary, as alleged hereinabove, Defendants actually concealed Sandusky's pattern of inappropriate contact with minor boys, misrepresented the degree of danger he posed, and affirmatively held him out to the public in general, and to The Second Mile in particular, as a dependable and respected member of the Penn State faculty.  PSU and Second Mile turned a blind eye to Sandusky's sexual exploitation of these children.  Both institutions fostered a culture and/or code of silence that unduly influenced those within their respective ranks from revealing conduct of the nature of that committed by Sandusky from being reported and acted upon.

84.     Years after abusing John Doe 6, Sandusky's abuse triggered the investigation of Sandusky by the Pennsylvania Office of the Attorney General that culminated in Sandusky's arrest on November 5, 2011, and a criminal indictment containing more than forty (40) counts.

85.     In late June 2012, Sandusky was convicted of forty-five (45) of forty-eight (48) counts of criminal sexual assault arising out of the events that are set forth in this Complaint. Specifically, as it concerned his molestation of John Doe 6, Sandusky was found guilty of: Unlawful contact with minors (18 Pa. C.S. §6318(a)(1)); Corruption of Minors (18 Pa. C.S. § 6301 (a)(1)); and Endangering Welfare of Children (18 Pa. C.S. § 4304 (a)(1)).

86.     In addition to its condemnation of the 1998-2001 cover-up perpetrated by Messrs. Paterno, Schultz, and Curley, the Freeh Report commissioned by the Defendant roundly condemned Penn State's Board of Trustees as well, stating, in part:

> The President, Senior Vice President, and General Counsel did not perform their duty to make timely, thorough and forthright reports of these 1998 and 2001 allegations to the Board. This was a failure of governance for which the Board must also bear responsibility.... From 1998-2011, Penn State's 'Tone at the Top' for transparency, compliance, police reporting and child protection was *completely wrong,* as shown by the inaction and concealment on the part of its most senior leaders, and followed by those at the bottom of the University's pyramid of power. This is best reflected by the janitors' decision not to report Sandusky's horrific 2000 sexual assault of a young boy in the Lasch Building shower. The janitors were afraid of being fired for reporting a powerful football coach.

87.     Defendants PSU, Second Mile and Sandusky acted with reckless indifference to the high degree of risk of physical harm to John Doe 6 that was known and/or should have been known by Defendants.  As a result of Defendants' conduct, as set forth in this Complaint, Plaintiff has suffered and continues to suffer physical and emotional injuries.

88.     As a direct and proximate result of Defendants' negligent, reckless, and outrageous conduct, as set forth in this Complaint, Plaintiff has suffered and continues to suffer physical and emotional injuries.

89.     As a further direct and proximate result of Defendants' negligent, reckless, and outrageous conduct, as set forth in this Complaint, Plaintiff requires and will likely require medical and psychological care for a lengthy period of time into the future.

90.     As a further direct and proximate result of Defendants' negligent, reckless, and outrageous conduct, as set forth in this Complaint, Plaintiff has suffered an impairment of his earning capacity.

91.     The injuries sustained by Plaintiff are expected to be permanent in nature.

92.     At all times material hereto, Defendants knew or had reason to know that Sandusky was exploiting Penn State and The Second Mile as a source of victims for his dangerous, unlawful, and outrageous sexual misconduct.

93.     Defendants, at all times material hereto, knew that children who were being served by The Second Mile and others were subject to a significant risk of serious physical harm due to Sandusky's affiliation with, and personal involvement with, both The Second Mile and the children served by the organization.

94.     Sandusky's reputation as a respected member of the Penn State faculty, and as a part of Penn State's well-respected athletic program, and Defendants; active concealment of Sandusky's pedophilia, were material factors in the decision of Plaintiff's mother to entrust Plaintiff to his care and oversight.

95.     The negligence, reckless, outrageous misconduct of Defendants, consisted, inter alia, of the following:

> a.     Failure to report Sandusky to law enforcement, child welfare, and/or public health authorities despite actual knowledge that he was a pedophile who had sexually assaulted and abused children on Penn State premises prior to 1998;

24

b.      Failure to report Sandusky to law enforcement, child welfare, and/or public health authorities despite having reason to know that he was a pedophile who had sexually assaulted and abused children on Penn State premises prior to 1998;

c.      Failure to report Sandusky to law enforcement, child welfare, and/or public health authorities despite actual knowledge of the significant risk of serious physical harm Sandusky posed to children left in his care or custody;

d.      Failure to adequately and timely disclose to the population served by The Second Mile that Sandusky was a pedophile who had sexually assaulted children on Penn State premises;

e.      Failure to adequately and timely disclose to the population served by The Second Mile facts that demonstrated Sandusky was a pedophile who was likely to sexually assault children;

f.      Failure to properly investigate incidents in which Sandusky was reportedly in the company of children in inappropriate settings, such as in the Lasch Building showers;

g.      Failure to timely and adequately alert The Second Mile's membership to the dangers posed by Sandusky;

h.      Allowing Sandusky and/or The Second Mile under Sandusky's supervision to use Penn State premises or facilities for events and/or private unsupervised inappropriate encounters with adolescent boys;

i.      Publically expressing support for Sandusky despite actual knowledge that he was a sociopath, a pedophile, and/or a danger to children;

j.      Failing to properly supervise and/or monitor Sandusky while he was on Penn State premises despite knowledge of and/or reason to know of the dangers he posed to children;

k.      Failure to have in place proper safeguards for whistle-blowers who would otherwise be reluctant to report improper conduct by athletic officials or other persons in positions of authority;

l.      Representing to the public, in general, and The Second Mile, in particular, that Sandusky was a dependable and trustworthy member of the Penn State faculty;

m.      Failure to restrict, limit, or prevent Sandusky's access to Penn State facilities;

n.      Failure to report Sandusky's sexual misconduct as required by Pennsylvania and Federal statutory law; and

o.      Knowingly and deliberately failing to disclose to the public in general, and The Second Mile in particular, information concerning Sandusky's dangerous sociopathic behavior;

p.      Providing financial, material, and public support for The Second Mile despite knowing or having reason to know that Sandusky was using the charity as a source of victims;

q.      Turning a blind eye to Sandusky's wrongful, tortious and illegal conduct as it related to adolescent boys on PSU premises and elsewhere;

26

r.     Remaining silent in the face of allegations by Sandusky and his representatives that called into question the veracity of the Plaintiff as it related to the charges against Sandusky for sexually abusing him;

s.     Concealing the events that were the subject of PSU's 1998 investigation that arose out of Defendant Sandusky molesting Plaintiff by misidentifying the investigation as an administrative matter, failing to identify Sandusky as a potential perpetrator on the face page of the report, and through other means;

t.     Subjecting Plaintiff to an abusive and coercive investigation of him, as victim, rather than conducting a thorough investigation of his assailant; and

u.     Violation of the principles of the Restatement (Second) of Torts, §§ 316 through 319.

96.     Plaintiff did not discover Penn State's or Second Mile's fraudulent concealment of Sandusky's sexually abusive conduct toward Plaintiff and others and their own wrongful conduct until recently when the news of the grand jury report became public.

97.     Penn State and Second Mile were each in a specialized position of trust where each had knowledge that Plaintiff did not. Each was in a position to have this knowledge because it was Sandusky's employer and/or because each was responsible for Sandusky. Plaintiff on the other hand was a minor. As a minor, he was not in a position to have information about Sandusky's molestation of other children or Penn State's or Second Mile's knowledge of the danger Sandusky posed to children.

98.     Second Mile and Penn State were each grossly negligent and acted with a reckless indifference and disregard for the welfare of Plaintiff and others similarly situated in managing

the risk posed to children by persons such as Sandusky.  Such conduct amounted to actual and/or implied malice on their parts.

99.    Had Penn State and Second Mile not acted wrongfully as herein described in managing the risk posed to children by persons, such as Sandusky, who have a sexual interest in children, Penn State and Second Mile each could have prevented many children, including the Plaintiff, from being sexually assaulted by Sandusky.

100.    At any time prior to 2011 had Penn State or Second Mile acted responsibly and in accordance with the duties each owed to the Plaintiff, Plaintiff would have been earlier identified and services could have been provided to him to begin to address the harm to him from Sandusky's sexual assaults.

101.    Neither Penn State nor Second Mile made any other report about the known sexual contact, and neither Penn State nor Second Mile took any other action to limit Sandusky's access to sexually exploit children, to report Sandusky to law enforcement or to ascertain if Sandusky had molested other children through either Penn State or Second Mile.

102.    Had such an investigation been done competently, its results reported, and action taken, both Penn State and Second Mile would have learned that Sandusky had been molesting children since at least the 1970's.

### COUNT I - CHILDHOOD SEXUAL ABUSE AND VICARIOUS LIABILITY
### Plaintiff, John Doe 6 v. Defendants Penn State, Second Mile, and Sandusky
### individually and in his official capacity with Penn State and Second Mile

103.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one were individually set forth within this Count.

104.    Second Mile operates activities for children in cooperation with Penn State.

105.    As described above and in this Count, in 1998 and beyond, Defendant Sandusky engaged in unpermitted, harmful and offensive sexual conduct and contact upon the person of Plaintiff, in violation of Pennsylvania state law. Said conduct was undertaken while Defendant Sandusky was under the supervision and authority of Penn State and under the supervision and authority of Second Mile.  The conduct of Defendant Sandusky was committed during the course and scope of his employment with Defendant Penn State and Defendant Second Mile.  Both Defendant PSU and Defendant Second Mile are vicariously liable for Sandusky's wrongful conduct alleged in this Complaint.

106.    Sandusky's sexual misconduct was ratified by Defendant Penn State.  Namely, as noted above, Defendant Penn State actually concealed Sandusky's pattern of inappropriate contact with minor boys, misrepresented the degree of danger he posed, and affirmatively held him out to the public as a dependable and respected member of the Penn State faculty. Following his retirement from Penn State, and despite Penn State's knowledge of Sandusky's sexual attraction to young boys, Penn State openly promoted Sandusky to the public at large as a dependable and respected member of the Penn State community, and maintained an ongoing special public relationship with Sandusky.   Penn State officials conferred upon Sandusky "emeritus status, a position that would enhance Sandusky's stature, reputation, and credibility.

107.    Sandusky's sexual misconduct was ratified by Defendant Second Mile.  Namely, as noted above, Defendant Second Mile actually concealed Sandusky's pattern of inappropriate contact with minor boys and misrepresented the degree of danger he posed.  Defendant Second Mile allowed Sandusky to remain in a leadership position, provided him with compensation and continued to furnish him with access to its facilities and, tragically, provided Sandusky with further access to minor boys.

108.    Prior to, during and after the abuse alleged above, Defendants Penn State and Second Mile, had reason to know, or should have had reason to know, that Defendant Sandusky posed a risk and would harm minors, including Plaintiff. Plaintiff was a minor at the time of his sexual abuse by Sandusky.  Plaintiff was subjected to an ongoing course of abusive conduct that was for Sandusky's sexual gratification.  Periodically, for many years following the events that occurred on or about May 3, 1998 and while Plaintiff was still a minor, Sandusky continued to tell Plaintiff that he loved him, kissed him and hugged him.   Defendant Sandusky's physical actions in this regard were for his own sexual gratification.  Those acts as well as expressing his love for Plaintiff were intended to favorably influence Plaintiff's feelings about Sandusky, and to keep him silent. Plaintiff withheld these occurrences from his parents.  During the same time, Sandusky continued to manipulate Plaintiff by including him in activities in the basement of Sandusky's home and Second Mile activities, and continued to provide Plaintiff to access to PSU football games, through free tickets to games. Defendants PSU and Second Mile are directly liable to Plaintiff for their inaction and affirmative conduct that enabled Sandusky to prey on Plaintiff and victimize him as described above and throughout this Complaint.

109.    Defendants' inaction and affirmative conduct enabling Sandusky to prey on Plaintiff and victimize him was outrageous and that conduct was committed with reckless indifference to Plaintiff.

110.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, public ridicule, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will

continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendants Penn State, Second Mile, and Sandusky, jointly and severally, in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

## COUNT II - NEGLIGENCE
### Plaintiff, John Doe 6 v. Penn State and Second Mile

111.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one was individually set forth within this Count.

112.    Penn State and Second Mile each had a duty to protect the minor Plaintiff when he was entrusted to their care by Plaintiff's mother.  Plaintiff's care, welfare, and/or physical custody was temporarily entrusted to Penn State and Second Mile, including without limitation, when Plaintiff attended functions or activities sponsored by or expressly or impliedly authorized by Penn State and/or Second Mile, and when on properties and premises operated by Penn State or Second Mile. Penn State and Second Mile solicited, and voluntarily accepted, the entrusted care of Plaintiff. As such, Penn State and Second Mile owed Plaintiff, a minor child, a special duty of care, in addition to a duty of ordinary care, and owed Plaintiff the higher duty of care to protect children from harm that is owed them by adults supervising children in their care. Plaintiff was owed by each of Penn State and Second Mile a duty to be protected from harm inflicted upon the Plaintiff by Defendant Sandusky when Plaintiff attended the activities of Second Mile, when Plaintiff attended the activities of Penn State, when the Plaintiff was on the premises of Penn State, where Defendant Sandusky was assigned and served, among other times.

31

113.    Defendant Second Mile, by and through its agents, servants and employees, knew or reasonably should have known of Defendant Sandusky's dangerous and exploitive propensities and/or that Defendant Sandusky was an unfit agent because of his sexual interest in children. It was reasonably foreseeable that if Second Mile did not adequately exercise or provide the duty of care owed to children in its care, including but not limited to Plaintiff, the children entrusted to the care of Second Mile would be vulnerable to sexual abuse by Second Mile personnel, including Defendant Sandusky.

114.    Defendant Penn State, by and through its agents, servants and employees, knew or reasonably should have known of Defendant Sandusky's dangerous and exploitive propensities and/or that Defendant Sandusky was an unfit agent because of his sexual interest in children. It was reasonably foreseeable that if Penn State did not adequately exercise or provide the duty of care owed to children in its care, including but not limited to Plaintiff, the children entrusted to the care of Penn State would be vulnerable to sexual abuse by Penn State employees, including Defendant Sandusky and thereby causing Plaintiff to be sexually molested and abused by Sandusky constituted outrageous conduct.

115.    Penn State and Second Mile each breached the duty of care owed to the minor Plaintiff by failing to protect the Plaintiff from foreseeable harm of the sexual misconduct of its employees or personnel, including Defendant Sandusky.

116.    Defendants' failure to protect Plaintiff from the foreseeable harm of Sandusky's sexual misconduct was outrageous and committed with reckless indifference to Plaintiff.

117.    As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, public ridicule, embarrassment, loss of self-esteem, disgrace, humiliation, and

loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendants Penn State and Second Mile, jointly and severally, in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

**COUNT III – NEGLIGENT SUPERVISION**
**Plaintiff, John Doe 6 v. Penn State and Second Mile**

118.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one were individually set forth within this Count.

119.    Penn State and Second Mile each had a duty to provide reasonable supervision of its employee and agent, Defendant Sandusky, when he interacted with children.

120.    It was reasonably foreseeable that those employees and agents of Penn State or Second Mile who have a sexual interest in children, including Defendant Sandusky, would sexually abuse children, including the Plaintiff, unless properly supervised.

121.    Penn State and Second Mile each, by and through its respective agents, servants and employees, knew, or reasonably should have known, of Defendant Sandusky's dangerous and exploitive propensities and/or that Defendant Sandusky was an unfit agent due to his sexual interest in children. Despite such knowledge, Defendant Penn State, and Defendant Second Mile, each breached its duty to provide reasonable supervision of Defendant Sandusky, and enabled Sandusky, who was in a position of trust and authority for each of Penn State and Second Mile, to sexually abuse and molest Plaintiff constituting outrageous conduct that was atrocious.

122.    Said acts of sexual abuse occurred upon the premises of Penn State, during the course of activities of Penn State, and during the course of activities of Second Mile. Defendants' conduct, specifically their breach of their duty to provide reasonable supervision of Sandusky, was outrageous and committed with reckless indifference to Plaintiff.

123.    As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, public ridicule, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendants Penn State and Second Mile, jointly and severally, in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

## COUNT IV – PREMISES LIABILITY
### Plaintiff, John Doe 6 v. Penn State

124.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one were individually set forth within this Count.

125.    Defendant Penn State and owed a duty to Plaintiff.

126.    By holding its premises or functions open to the public and inviting Plaintiff and/or authorizing Sandusky to invite Plaintiff onto its premises and/or to attend functions and activities for the purposes of participating in youth activities or to engage in organized and unorganized activities with Sandusky on its premises, Penn State assumed a duty to Plaintiff.

127.   Penn State assumed a duty to Plaintiff that it would exercise reasonable care and take reasonable precaution against harmful third party conduct on its premises that it could reasonably anticipate.

128.   Penn State breached this duty when it failed to exercise reasonable care to discover that Defendant Sandusky was utilizing its premises and/or its public image and/or its functions to commit sexual abuse against minor children.

129.   Penn State also breached this duty when it failed to exercise reasonable care in giving adequate warning to Plaintiff that Defendant Sandusky was a danger to children.

130.   Defendant Penn State's failure to exercise reasonable care to discover that Defendant Sandusky was utilizing its premises to commit sexual abuse against minor children was outrageous and committed with reckless indifference to Plaintiff.

131.   As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, public ridicule, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendant Penn State in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Plaintiff, John Doe 6 v. Penn State and Second Mile

132.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one were individually set forth within this Count.

133.    By employing Sandusky, by choosing to place Sandusky in a position working and/or interacting unsupervised with children, by allowing Sandusky to use their facilities for youth activities and on-on-one encounters with minor boys, where he accessed and sexually abused numerous children, and caused Plaintiff to be sexually abused as a child, Penn State and Second Mile did by outrageous conduct intentionally or recklessly cause severe emotional distress and bodily harm to Plaintiff.

134.    Penn State's and Second Mile's conduct in employing Sandusky, and holding him out in such a way as to cause the Plaintiff, his family and the public to believe he was the agent, servant and/or employee of each, holding out its premises as a safe environment for children when it had reason to know it could be a dangerous place for children, and thereby causing Plaintiff to be sexually molested and abused by Sandusky constituted  outrageous conduct that was atrocious and went beyond all bounds of decency to a point where it was conduct utterly intolerable in a civilized society.

135.    Penn State and Second Mile's conduct was outrageous as both acted with reckless indifference to Plaintiff's rights in employing Sandusky to work unsupervised with children and/or allowing him to use their facilities for youth functions thereby causing Plaintiff to be sexually abused by Sandusky.

136.    Plaintiff suffered severe emotional distress, including severe mental anguish and horror, because of Penn State's and Second Mile's reckless, extreme and outrageous conduct.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendants Penn State and Second Mile, jointly and severally, in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

## COUNT VI – CIVIL CONSPIRACY TO ENDANGER CHILDREN
### Plaintiff, John Doe 6 v. Penn State and Sandusky

137.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each and every one were individually set forth within this Count.

138.    Defendants Penn State and Sandusky, along with individuals at Penn State not presently named as Defendants, acted with a common purpose, and conspired to endanger the welfare of children, including the Plaintiff.

139.    Plaintiff has standing to bring this claim because he was one of the children who was sexually abused as a result of this conspiracy to endanger the welfare of children.

140.    Penn State, acting by and through Spanier, Paterno, Schultz, Curley, Sandusky, and/or other Penn State employees agreed and/or combined to unlawfully conceal from the public the fact that Sandusky sexually abused and showered with young boys prior to 1998 as witnessed by several Penn State coaches and others, that he sexually abused Plaintiff in 1998. Penn State, acting by and through Spanier, Paterno, Schultz, Curley, Sandusky, and/or other Penn State employees agreed and/or combined to unlawfully conceal from the public the fact that Sandusky continued to sexually abuse and shower with young boys for years after his abuse of John Doe 6 and engaged in an ongoing course of abusive conduct toward Plaintiff and other young boys.

141.    Penn State and Sandusky sought to conceal Sandusky's conduct because Defendants knew: (a) a sexual assault on Penn State premises by a member of the Penn State

faculty could subject the University to liability (b) disclosure of the incident would lead to an investigation of other unlawful acts committed by Sandusky on Penn State premises while he was a Penn State employee, and that such an investigation could subject the University to liability (c) disclosure would lead to an investigation of Penn State's code/culture of silence in which Sandusky was permitted to abuse children with impunity.  Sandusky, for his part, had an interest in concealing his conduct because its disclosure would subject him to criminal and civil liability, and would similarly lead to an investigation of other acts of sexual misconduct.

142.    Defendant Penn State agreed and/or combined with Sandusky to conceal the fact that Sandusky sexually abused and showered with young boys prior to 1998, that he sexually abused Plaintiff in 1998, and that Sandusky continued to engage in an ongoing course of abusive conduct toward Plaintiff and other young boys knowing that nondisclosure would endanger other children, including plaintiff herein, in particular.

143.    Instead of protecting children, including Plaintiff, from sexual abuse by Sandusky, Defendant Penn State and Sandusky acted in concert to shield Sandusky from criminal detection, shielded the hierarchy and the leadership of Penn State from scandal, attempted to shield Penn State from financial liability, fostered a culture of silence, and attempted to protect its reputation rather than protecting, and helping, children. These acts of shielding directly injured Plaintiff because Defendant Penn State's unsafe environment, inadequate child protection measures, and prior incidents of sexual abuse by Defendant Sandusky were hidden from Plaintiff and Defendant Sandusky was able to gain unsupervised access to Plaintiff as a result.  As a result, Sandusky was able to groom, abuse and terrorize Plaintiff in 1998 and for many years thereafter.  As a direct result of Penn State and Sandusky's shielding attempts, while Plaintiff was still a minor, Sandusky continued to tell

Plaintiff that he loved him, kissed him, and hugged him.  As a direct result of Penn State and Sandusky's shielding attempts, Plaintiff was caused to suffer further humiliation, embarrassment and injury during when Sandusky publicly attacked Plaintiff's credibility.  As a direct result of Penn State and Sandusky's shielding attempts, other molestation victims did not come forward.  As a further and direct result of the shielding, Sandusky continued to manipulate Plaintiff (intending to keep Plaintiff silent) by including him in activities in the basement of Sandusky's home and Second Mile activities, and continued to provide Plaintiff to access to PSU football games, through free tickets to games.

144.    In addition, Plaintiff's status as a victim of Sandusky was concealed, and no assistance or compensation was provided to the Plaintiff. This concealment created a false public impression that Sandusky was a safe person to be around children, when he, in fact, was not. The concealment by Defendant Penn State and Sandusky and others created a false public impression that Second Mile and Penn State were safe activities for children, when they, in fact, were not.

145.    Penn State and Sandusky did not disclose his sexual misconduct to the public. Sandusky, in turn, purposefully and unlawfully used Penn State and the charity as a source of children whom he could sexually assault and abuse.

146.    In furtherance of the conspiracy, Defendant Penn State affirmatively conferred upon Sandusky permission to use the University facilities, inviting children to utilize the facilities with him, unsupervised, during off-hours.

147.    As a direct and proximate result of the conspiracy, children remained unaware of the dangers posed by Sandusky.

148.   As a direct and proximate result of the conspiracy as described in this complaint, Defendant Penn State, Sandusky unlawfully sexually abused young boys.  As a direct and proximate result of the agreement and conspiracy between Sandusky and Penn State, plaintiff sustained the injuries set forth in more detail elsewhere in this Complaint.  This concealment directly injured Plaintiff because Penn State's and Second Mile's unsafe environment and inadequate measures, prior incidents of sexual abuse by Defendant Sandusky, and the risk Sandusky represented, were hidden from Plaintiff and his family, and Defendant Sandusky was able to gain unsupervised access to Plaintiff to engage acts of sexual abuse as a result. This concealment also directly injured Plaintiff because the concealment by the Defendants and third persons created a false public impression that Sandusky was a safe person to be around children, when he, in fact, was not. It also created the impression that Penn State and Second Mile were safe environments with adequate measures to protect children.

As a direct and proximate result of the agreement and conspiracy between Sandusky and Penn State, Plaintiff was sexually assaulted and molested by Sandusky as described in this Complaint. Additionally, Sandusky was able to continue to groom, abuse and terrorize Plaintiff for many years following the events of 1998.  Moreover, the agreement and conspiracy between Sandusky and Penn State caused Plaintiff to suffer further humiliation, embarrassment and injury during Penn State's abusive investigation and when Sandusky publicly attacked Plaintiff's credibility.

149.   The agreement and conspiracy between Sandusky and Penn State and the concealment of Sandusky's heinous acts was outrageous and committed with reckless indifference to Plaintiff.

150.    As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, public ridicule, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHERFORE, Plaintiff John Doe 6 demands judgment for compensatory damages against Defendants Penn State and Sandusky, jointly and severally, in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with interest, costs, and any other appropriate relief.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this matter.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Economic and non-economic damages and damages for pain and suffering and loss of basic and pleasurable activities in an amount in excess of $75,000 as provided by law and to be supported by the evidence at trial;

2.  For compensatory and other damages according to proof;

3. For punitive damages against Defendants according to proof;

4. For an award of attorneys' fees and costs;

5. For prejudgment interest and cost of suit; and

6. For such other and further relief as this Court may deem just and proper.

Dated this ___21st___ day of ___January___, 2013

By: _____

Brian Ketterer, Esquire ( Bar # 88898)
Hal Kleinman, Esquire (Bar # 92702)
JANET, JENNER & SUGGS, LLC
1777 Reisterstown Road
Suite 165
Baltimore, MD 21208
(410) 653-3200
(410) 653-6903 (fax)


Howard Alan Janet, Esquire
(By Application for Special Appearance)
Kenneth M. Suggs, Esquire
(By Application for Special Appearance)
Jason B. Penn, Esquire
(By Application for Special Appearance)
JANET, JENNER & SUGGS, LLC
1777 Reisterstown Road, Suite 165
Baltimore, MD 21208
(410) 653-3200
(410) 653-6903 (fax)
Attorneys for Plaintiffs