# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE 6, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | No. 13-0336 |
| v. | : | |
| | : | |
| THE PENNSYLVANIA | : | |
| STATE UNIVERSITY, | : | |
| THE SECOND MILE, and | : | |
| GERALD SANDUSKY, | : | |
|     Defendants. | : | |

## MEMORANDUM

Plaintiff John Doe 6 ("Doe") brings suit against Defendants Pennsylvania State University ("PSU"), The Second Mile ("Second Mile"), and Gerald Sandusky ("Sandusky"). Doe claims that Defendant Sandusky sexually abused him in showers on the PSU campus, and that Defendants PSU and Second Mile engaged in a variety of tortious conduct in connection with this abuse. Specifically, Doe sues PSU for vicarious liability, negligence, negligent supervision, premises liability, intentional infliction of emotional distress, and civil conspiracy.[1] PSU moves to dismiss Doe's vicarious liability and civil conspiracy claims. For the reasons stated below, I will grant PSU's motion to dismiss Doe's vicarious liability claim and will deny PSU's motion to dismiss Doe's civil conspiracy claim without prejudice to PSU to raise the issue at a later stage of the litigation.[2]

---

[1] Although Doe also brings suit against Second Mile and Sandusky, only Doe's claims against PSU will be discussed for the purposes of this motion to dismiss.

[2] Diversity jurisdiction lies over Doe's state law tort claims under 28 U.S.C. § 1332.

1

# I. BACKGROUND[3]

PSU is a public, state-related university in the Commonwealth of Pennsylvania. Sandusky is a former employee of PSU and worked as the defensive coordinator for the university's Division I football program for twenty-three years. During Sandusky's tenure, Joe Paterno served as head football coach of PSU and had "legendary status" in Pennsylvania for his record number of wins. Doe claims that Sandusky "exploited his status as an associate of Paterno and member of the PSU football staff to further his grooming and assaults on young boys."

In 1977, Sandusky founded Second Mile, a charity dedicated to helping children with dysfunctional families. Since its inception, Second Mile has had substantial social and financial links to PSU. Significantly, PSU authorized Sandusky to bring children from Second Mile to PSU's premises and allowed Sandusky and these children to use PSU's facilities together without supervision. Doe participated in Second Mile activities and was one of the children that PSU allowed Sandusky to bring to campus.

In April 1998, Doe, then eleven-years old, met Sandusky at a Second Mile event. On or about May 3, 1998, Sandusky called Doe's home and invited him to exercise at a PSU athletic facility that evening. Doe accepted the invitation and Sandusky picked him up at his house around 7:00 p.m. On the drive to PSU, Sandusky "repeatedly and inappropriately" placed his hand on Doe's leg. When they arrived at PSU, Sandusky took Doe to the Lasch Building—the main PSU football facility—which contained Sandusky's and Paterno's offices, as well as exercise machines, dressing rooms, and showers. Sandusky led Doe to the coaches' locker room where Sandusky gave Doe a pair of Paterno's socks as a souvenir and wrestled with Doe. Doe claims that "[w]restling was merely a ruse to afford Sandusky an opportunity to put his hands on

---

[3] Facts are taken from the Complaint unless otherwise stated. Because this memorandum discusses Doe's vicarious liability claim, only facts relevant to that claim are summarized.

2

and rub his body against Plaintiff's adolescent male body for the purpose of Sandusky's sexual gratification." After wrestling, Sandusky and Doe worked out on exercise machines. Following the work out, Sandusky kissed Doe's head and said, "I love you." Doe states that Sandusky did this to groom Doe for "more advanced sexual activity." Sandusky then led Doe to a locker room, where Sandusky took off his clothes and turned on the showers. Although Doe was reluctant to shower, Sandusky told him that "All the boys do it," and used "undue influence based on his stature" to entice Doe to shower. After Doe entered the shower, he went to the shower head farthest away from Sandusky, because he felt "[e]xtremely uncomfortable . . . being naked and seeing Sandusky naked." Sandusky, however, directed Doe to a shower closer to Sandusky, claiming that he had already warmed the water for Doe.

While naked in the shower, Sandusky engaged in physical contact with Doe. Sandusky "wrapped his hands around [Doe]'s torso from behind and pressed his body, including his genitals, against Plaintiff and said, 'I'm gonna squeeze your guts out.'" Sandusky also acted as a self-described "Tickle Monster" as a pretense for touching Doe in the shower. Finally, Sandusky lifted Doe, claiming to want to rinse the soap out of Doe's hair. When Sandusky picked Doe up, Doe's feet were "'up pretty high' near Sandusky's waist. John Doe 6's body contacted Sandusky's chest and his feet touched Sandusky's thigh. This likely brought Sandusky's genitals into contact with the boy's body. . . . [and] likely brought this young boy's genitals up to Sandusky's face." After Sandusky lifted him, Doe cannot recall what followed, and describes the subsequent events as "just kind of black." Following the shower, Sandusky promised Doe that he would take him to the movies and allow him to sit on the PSU bench during a football game.

Sandusky brought Doe home around 9:00 p.m. Doe's mother noticed that he was acting the way he did when he was upset. Doe told his mother he showered with Sandusky. The next

3

morning Doe's mother called Alycia Chambers, Ph. D., a licensed psychologist, who told Doe's mother to report the incident to authorities. Doe's mother called the local police, but was redirected to the PSU police department. She reported the incident to a PSU Police Department detective around 11 a.m. Around 11:30 a.m., a PSU detective interviewed Doe. Doe told the detective some of the story and also that his ten-year old friend had experienced a similar shower incident with Sandusky. On May 4, 1998, the PSU detective and a Centre County Children and Youth Services ("CYS") case worker (who Doe claims had conflicts of interest) spoke with Doe's friend, who described two incidents in which Sandusky took him to the Lasch building, wrestled with him, and inappropriately touched him in the shower. After the interview with Doe's friend, the PSU detective and CYS caseworker re-interviewed Doe. Doe claims that during these interviews and on other occasions, PSU investigators intimidated him and made him feel guilty for any trouble that might befall Sandusky.

Alycia Chambers also met with Doe on the day after the shower incident, and subsequently made a report to the Pennsylvania child abuse line. She consulted with colleagues who agreed that "the incidents meet all of our definitions, based on experience and education, of a likely pedophile's pattern of building trust and gradual introduction of physical touch, within a context of a 'loving,' 'special' relationship." Chambers produced a written report describing Sandusky as a likely pedophile, and provided this report to PSU's detective on May 7, 1998. On May 8, 1998, PSU directed an unlicensed psychologist to conduct an evaluation of Doe, thus forcing Doe to relive the incident for the fourth time in less than a week.

In the meantime, Sandusky had called Doe multiple times, including twice on May 3, 1998[4] and once on May 6, 1998, when he left a voicemail asking Doe to work out with him. On

---

[4] May 3, 1998 is also the day that the shower incident allegedly occurred. It is thus unclear whether these two phone calls occurred on the same day as the shower incident or if one of the dates assigned to these incidents is incorrect.

4

May 12, 1998, Sandusky called Doe again and arranged to pick him up the following day. On May 13, 1998, PSU detectives and a local police officer hid inside Doe's house and covertly listened to Sandusky's conversation with Doe's mother. Sandusky admitted that he had physical contact with Doe. Doe's mother said she thought it was best if Sandusky left him alone. On May 19, 1998, Doe's mother again spoke with Sandusky and asked "Sandusky about the bear hug in the shower, and whether his 'private parts' touched the boy while they hugged. Sandusky did not deny it. He said 'I don't think so…maybe.'" He also admitted to showering with other boys and telling Doe that he loved him. Sandusky asked to speak with Doe, but Doe's mother refused and asked Sandusky not to attend Doe's baseball games. Sandusky responded "I understand. I was wrong. I wish I could get forgiveness. I know I won't get it from you. I wish I were dead."

On June 1, 1998, PSU investigators interviewed Sandusky, who admitted to previously showering with other boys. The PSU detective advised Sandusky not to shower with children, and Sandusky said that he "wouldn't." At the end of the investigation, PSU's investigator thought Sandusky's actions warranted criminal charges, but this recommendation was not documented or incorporated into PSU's investigation file. The District Attorney declined to formally charge Sandusky.

Doe alleges that from May 4, 1998 until the conclusion of the police investigation, PSU employees Schultz, Curley, Spanier, and Paterno were informed of the details of the allegations against Sandusky and received updates on the investigation. On May 5, 1998, Schultz learned from the police chief that PSU police were "going to hold off" making a crime log entry—a public record—on the incident. The report was ultimately opened as an "Administrative Information" file. In early June 1998, Schultz, Curley, and Spanier were informed that investigators "'concluded that there was no criminal behavior and the matter was closed as an

5

investigation.'" Doe claims that after the end of the investigation, PSU employees did not discuss the incident with Sandusky, did not limit his use of PSU facilities, did not monitor his activities, did not contact the Office of Human Resources for guidance, and did not take any personnel actions concerning the incident. Instead, in 1999, PSU offered Sandusky monetary and "retirement" incentives. PSU also openly endorsed Sandusky to the public and granted him "emeritus status." Doe thus claims that "PSU's response to Sandusky's sexually abusive behavior to minor boys, including Plaintiff, was to cover it up and in effect reward him . . . ."

In June 2012, more than a decade after the incident, Sandusky was convicted of 45 counts of criminal sexual assault. With respect to Doe, he was found guilty of unlawful contact with minors, corruption of minors, and endangering the welfare of children.

## II. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

### A. Vicarious Liability Claim

PSU moves to dismiss Doe's claim that PSU is vicariously liable for Sandusky's abusive actions against Doe. PSU argues that Doe's vicarious liability claim cannot succeed as a matter of law, because Sandusky's acts of molestation are outrageous and unlawful actions that fall outside the scope of his employment.

Under the Pennsylvania law[5] of *respondeat superior*, "[a]s a general rule[,] a master is liable for the tortious acts of his servant done in the course of his employment, and within the general scope of his authority." *Lunn v. Boyd*, 169 A.2d 103, 104 (Pa. 1961) (internal quotation marks omitted). "This liability of the employer may extend even to intentional or criminal acts committed by the servant." *Fitzgerald v. McCutcheon,* 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979). Pennsylvania follows the Restatement (Second) of Agency § 228 in determining whether an employee's act is within the scope of employment. Under the Restatement,

> (1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master. (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Fitzgerald*, 410 A.2d at 1272 (quoting Restatement (Second) of Agency § 228 (1958)).

Although the determination of whether an employee's act is within his/her scope of employment is typically a question for the jury, certain types of outrageous actions fall outside the scope of employment as a matter of law. *Id.* at 1271-72. Pennsylvania courts have held that

---

[5] The parties do not dispute that Pennsylvania law governs Doe's claims.

"[w]here . . . the employee commits an act encompassing the use of force so excessive and dangerous, as to be totally without responsibility or reason . . . , the employer is not liable as a matter of law." *Lunn*, 169 A.2d at 104. The employer is not responsible for such acts, because "[i]f an assault is committed for personal reasons or in an outrageous manner, it is not actuated by an intent of performing the business of the employer and is not done within the scope of employment." *Fitzgerald*, 410 A.2d at 1272 (citing *Lunn,* 169 A.2d at 104-05); *see also Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955) ("'The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business . . . . In such cases, the facts may indicate that the servant is merely using the opportunity offorded [sic] by the circumstances to do the harm.'" (quoting Restatement of Agency § 235 cmt. c)). Thus, while certain actions of willful misconduct by an employee may occur in the *course* of employment, they still fall outside the *scope* of that employment. *Doe v. Liberatore*, 478 F. Supp. 2d 742, 758 (M.D. Pa. 2007) (citing *McMaster v. Reale,* 110 A.2d 831, 832 (Pa. Super. Ct. 1955)); *see also Howard v. Zaney Bar*, 85 A.2d 401, 403 (Pa. 1952) ("'For a willful or intentional trespass by an employe [sic] outside the line of his duty under his employment, it is settled that the employer is not responsible, even though it be committed while the servant is in the exercise of his employment.'" (quoting *Berryman v. Pennsylvania R. Co.,* 77 A. 1011, 1012 (Pa. 1910)) (internal quotation marks omitted)).

Doe contends that it is too early in the litigation to decide whether Sandusky's actions were within the scope of his employment. PSU retorts that, regardless of the posture of the case, Doe's claim should be dismissed because Sandusky's actions—as pled by Doe—fall precisely within the category of "outrageous" assaults that an employer is not vicariously liable for as a

matter of law.[6] However, Pennsylvania intermediate appellate courts have consistently held that sexual abuse of minors falls outside an employee's scope of employment, because such acts of abuse are not of the kind and nature he/she was employed to perform and not for the employer's benefit. In *Sanchez by Rivera v. Montanez*, 645 A.2d 383 (Pa. Commw. Ct. 1994), the court rejected a plaintiff's claim that a day care should be vicariously liable for an employee's acts of molestation that occurred over the course of three years on its premises. In so holding, the court noted that settled Pennsylvania law on this subject dictated the result:

> [The plaintiff] acknowledges in his brief that asking us to reverse the trial judge's entry of summary judgment on the issue of respondeat superior is tantamount to "asking the Court to break new ground." There can be no doubt that [the employee]'s actions were conducted for personal reasons only and were utterly outrageous in manner. Although we certainly commiserate with [the plaintiff]'s plight, we are obliged to follow and not reject the deeply entrenched law on this subject.

*Sanchez by Rivera*, 45 A.2d at 391 (citation omitted). As a result of the day care worker's personal motive and the "outrageous" nature of his actions, the court dismissed the plaintiff's vicarious liability claims.

Similarly, in *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692 (Pa. Super. Ct. 2000), the Pennsylvania Superior Court rejected a plaintiff's vicarious liability claim against a church that employed a minister who sexually abused the plaintiff. The court found that "[n]othing about [the employee's] sexual abuse of [the plaintiff] had any connection to the kind

---

[6] The Pennsylvania Supreme Court has not yet discussed vicarious liability in the child abuse context. As a federal district court, my role is to predict how the Pennsylvania Supreme Court would rule on this subject. *See U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996) ("When a state's highest court has not spoken on a subject, we must attempt to predict how that tribunal would rule."). "In making such determinations, [the court should] give due deference to the decisions of lower Pennsylvania courts. . . . The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent a persuasive indication that the highest state court would rule otherwise." *Id.* (citation omitted). The court may also look to the Restatement of the Law. *See Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010).

9

and nature of his employment as a minister. . . . Nor was [the employee]'s abusive behavior actuated by any purpose of serving the Church." *First Church*, 748 A.2d at 700. Citing similarities in *Sanchez by Rivera*, the *First Church* Court concluded that it "need not tarry long in reaching the same conclusion" as *Sanchez by Rivera* that the employer was not liable, because "the employee's actions were clearly outrageous and motivated by purely personal reasons." *Id.*

In accordance with the reasoning articulated in *First Church* and *Sanchez by Rivera*, two recent federal district court opinions applying Pennsylvania law have similarly rejected claims that an employer is vicariously liable for child abuse. In *Doe v. Liberatore*, 478 F. Supp. 2d 742 (M.D. Pa. 2007), the court found that a diocese, church, and bishop were not vicariously liable for a priest's sexual abuse of a minor. Although the abuse occurred on church premises and the church had previous notice of the priest's improprieties, the court nonetheless dismissed the plaintiff's vicarious liability claim because "the acts of sexual abuse perpetrated by [the priest] were both outrageous and certainly not actuated by any purpose of serving the Diocese, Sacred Heart or Bishop Timlin. As such, no reasonable jury could find in favor of Plaintiff on his vicarious liability claim." *Doe*, 478 F.Supp.2d at 758. Similarly, in *Joseph M. v. Northeastern Educational Intermediate Unit 19*, the court concluded that a school was not vicariously liable for the acts of a special education teacher who physically abused and used aversive techniques[7] on an autistic student. 516 F. Supp. 2d 424 (M.D. Pa. 2007) *on reconsideration*, No. 3:06-CV-01903, 2007 WL 2845004 (M.D. Pa. Sept. 26, 2007). Although school supervisors knew about

---

[7] Aversive techniques "are deliberate activities designed to establish a negative association with a specific behavior." *Joseph M. v. Ne. Educ. Intermediate Unit 19,* 516 F. Supp. 2d 424, 431 (M.D. Pa. 2007). These techniques included abusive actions such as: "(a) strapping [the plaintiff] to a Rifton Chair with silver duct tape around his legs, rendering him unable to move, (b) punishing [the plaintiff] by depriving him of his "Picture Exchange System," which book served as [plaintiff]'s main means of communicating his basic needs and necessities, including, but not limited to bathroom use and hunger, (c) backhanding [the plaintiff] in the face, causing blood to gush from his nose and lips, (d) pinching [the plaintiff], leaving finger-mark bruising on his arms, (e) hitting [the plaintiff], leaving cuts on his face, legs, back, and pelvis, and (f) stepping on [the plaintiff]'s insteps, causing bruising to the tops of his feet." *Id.*

the teacher's abusive conduct and failed to take action, the court found that the school was not vicariously liable because the teacher's conduct was outrageous and not actuated by intent to serve the employer. *Id*. at 446.

In response to these cases, Doe argues that sexual abuse does not *always* fall outside an employee's scope of employment. Doe primarily rests his case upon *Patel v. Himalayan International Institute of Yoga Science & Philosophy of the USA*, No. 3:CV-94-1118, 1999 WL 33747891 (M.D. Pa. Dec. 9, 1999) as an example in which a court applied Pennsylvania law to hold that an employer could be vicariously liable for sexual misconduct. *Patel*, however, involved an adult victim abused in the course of a counseling relationship, in which the abuser utilized sex as a part of a treatment regimen that was intended to serve the employer.[8] In *Patel*, the court refused to overturn a jury verdict that held a yoga health institute vicariously liable for sexual abuse perpetrated by the institute's spiritual leader/guru. The court found that the facts supported a finding of vicarious liability because the guru was the "*de facto* and *de jure* head" of the institute and was permitted to use the institute to further his goals, whatever they may be. *Patel*, 1999 WL 33747891, at *2, *9. The institute's president and others at the institute viewed the guru as a "god" and an "'enlightened being' possessing supernatural powers." *Id*. at *2. The guru had not only founded the institute, but had "total authority" over the institute, selecting its

---

[8] Doe also cites *Nardella v. Dattilo (No.2)*, 36 Pa. D. & C.4th 364, 377-78 (Com. Pl. 1997) as an example of a case in which a Pennsylvania trial court has found that an employer could be vicariously liable for sexual misconduct. Like *Patel*, *Nardella* involved an adult plaintiff who was sexually abused by a priest as part of a counseling relationship. The court found that the priest's counseling was "arguably" within the scope of his "priestly duties," and was intended to "facilitate [the plaintiff's] return to the Catholic Church," and thus benefit the church. *Nardella*, 36 Pa. D. & C.4th at 377-78. Furthermore, at least one other court has noted that *Nardella* appears to be an aberration from the general rule in Pennsylvania that outrageous sexual misconduct is outside the scope of employment. In *Tell v. Roman Catholic Bishops of Diocese of Allentown*, No. CIVA09C05171JAP, 2010 WL 1691199, at *11 (Del. Super. Apr. 26, 2010), the court concluded that *Nardella*'s vicarious liability analysis "does not . . . seem to be the law of Pennsylvania. *Nardella* has never been cited with approval for this point by any court." The *Tell* court also correctly noted that the Pennsylvania Superior Court's subsequent decisions in *First Church* and *Hutchinson v. Luddy,* 683 A.2d 1254, 1256 (Pa. Super. Ct. 1996), *vacated in part on other grounds,* 742 A.2d 1052 (Pa.1999) seem to contradict *Nardella*'s holding. *Id*. Like the *Tell* court, I find *Nardella* to be unpersuasive.

board of directors and officers and possessing "final, mandatory and recommending powers in all spiritual and administrative matters at the [institute]." *Id*. Additionally, the institute was regarded as a "vehicle" for the guru's own work, and the "[i]nstitute permitted [the guru] to pursue his work for the benefit of the corporation, including his counseling and teaching, in whatever manner he chose and with absolute authority to determine the scope of his agency and conduct." *Id*. at *9 (internal quotation marks omitted).

With respect to the plaintiff in *Patel*, the guru used his position as a religious leader to convince the plaintiff to engage in relations with him by telling her that it was a "sin" to "doubt her guru." *Id*. at * 3. The guru "had indicated to [the plaintiff], herself, that sexual relations with [the guru] were part of his therapeutic regimen and had convinced [the plaintiff] that he was simply 'testing' her for her own good." *Id*. at *9. In short, the guru had the authority to and did in fact "ma[ke] sex part of the [i]nstitute's 'holistic health services' to [the plaintiff]." *Id*. Based on these exceptional facts directly connecting the guru's abusive actions with his scope of employment, the *Patel* court concluded that the evidence sufficiently supported the jury's finding that the institute was vicariously liable for the guru's misconduct. Given these unusual and distinguishable facts, I am un-persuaded that *Patel* should control in this case. Rather, the facts pled by Doe are more analogous to those in *First Church*, *Sanchez by Rivera*, *Liberator*e, and *Joseph M*.

Based on the allegations in Doe's Complaint, Sandusky's sexual abuse of Doe falls outside the scope of his employment under Pennsylvania law. Although the Complaint recites that Sandusky's conduct "was committed during the course and scope of his employment with Defendant Penn State," it fails both to explain how molestation was the kind of act that PSU employed Sandusky to perform or how Sandusky was actuated by intent to serve PSU.

12

First, in terms of the kind and nature of Sandusky's employment, the Complaint states that Sandusky served as a former defensive coordinator and coach for PSU's Division I football team, and assaulted Doe while employed by PSU. The Complaint further describes Sandusky's authorized use of PSU facilities for his activities with Second Mile. Doe argues that Sandusky's "abuse had a connection to the kind and nature of his employment as a coach and ambassador for the university." Pl. Resp. Mot. Dismiss at 11. However, Doe does not explain how child abuse is conduct of the kind and nature that a football coach or ambassador would be employed to perform. Although the Complaint alleges that Sandusky exploited his employment with PSU in order to molest Doe, Doe presents no facts that support the conclusion that this outrageous conduct was the kind that PSU employed Sandusky to perform.

Second, in terms of whether Sandusky's conduct was actuated by intent to serve PSU, the Complaint states the opposite—that Sandusky molested Doe for his own personal reasons and deviant gratification. For instance, the Complaint claims that "virtually all of Sandusky's conduct in connection [with] his interaction with Plaintiff on . . . [the date of the shower incident] was for the purpose of sexually gratifying Sandusky." Pl. Complaint ¶ 37; *see also id.* ¶ 25 ("Sandusky was sexually victimizing minor boys for his own sexual gratification, including those that he lured onto PSU's campus . . . ."). Furthermore, Doe's Complaint characterizes Sandusky's acts as "criminally outrageous and depraved acts," *Id.* ¶ 82, and "dangerous, unlawful, and outrageous sexual misconduct." *Id.* ¶ 92. Given these allegations, it is simply too far of a stretch to conclude that Sandusky's assaults were actuated by intent to serve PSU. Rather, Sandusky's molestation constitutes an outrageous act committed for Sandusky's own deviant personal reasons, for which PSU cannot be vicariously liable.

Doe also argues that even if Sandusky's actions were not initially within the scope of his

employment, PSU subsequently ratified those actions and is thus vicariously liable for them. When an employer or other principal ratifies an agent's previously unauthorized act, the "principal becomes subject to liability for injuries caused by the tortious act of one acting or purporting to act as his agent as if the act had been authorized . . . ." Restatement (Second) of Agency § 218 (1958). Specifically, Doe claims that PSU ratified Sandusky's sexual assault by failing to further investigate Doe's allegations, failing to limit Sandusky's access to PSU facilities, and by giving Sandusky retirement benefits and emeritus status. Under the Restatement (Second) of Agency, "[r]atification is the affirmance by a person of a prior act which did not bind him *but which was done or professedly done on his account*, whereby the act, . . . is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958) (emphasis added). Thus, based on the Restatement, PSU's conduct does not constitute ratification of Sandusky's actions, because, as discussed above, Sandusky's assaults were not done on PSU's account, but for his own personal purposes.

In addition, Pennsylvania law does not provide support for Doe's ratification argument. PSU correctly asserts that none of the cases discussing vicarious liability for sexual abuse consider the possibility of ratification. Doe also does not supply any case in which a court has held an employer vicariously liable for an employee's "outrageous act" based on ratification grounds.[9] Furthermore, in *Potter Title & Trust Co. v. Knox,* 113 A.2d 549 (Pa. 1955), the Pennsylvania Supreme Court soundly rejected the plaintiffs' argument that a cab company ratified a cab driver's deadly shooting by continuing to employ the cab driver and representing

---

[9] Doe cites only *Sabric v. Lockheed Martin*, No. 3:09-CV-02237, 2010 WL 569574 (M.D. Pa. Feb. 12, 2010) in support of his ratification argument. In *Sabric*, the court found that an employer could be vicariously liable for its employees' negligent failure to report the violent behavior of an independent contractor security guard who later shot an employee. The *Sabric* Court, however, only mentioned the concept of ratification in passing, and neither found that the employer could be liable on ratification grounds, nor even discussed the concept of ratification. 2010 WL 569574, at *5.

him in court. In *Potter*, cab company officials held a meeting at which they encouraged cab driver employees to "protect themselves against attacks by . . . strikers" from an opposing cab company and characterized the situation as a "showdown." *Potter*, 113 A.2d at 550, 554. At the meeting, company officials passed around pieces of pipe to the drivers[10] and told them that "if you get in trouble protecting yourself the company will go broke behind you." *Id.* at 551 (internal quotation marks omitted). After this meeting, one of the cab drivers fired a revolver into a group of rival cab drivers on the sidewalk as he was driving through an intersection. The court concluded that this violent act fell outside the scope of his employment as a matter of law, because the cab driver was not acting in self-defense, but rather as a reckless and unprovoked aggressor. *Id*. at 551-52. The plaintiffs, however, also contended that the cab driver's employer "*ratified* the shooting because the company's attorney represented [the cab driver] in the criminal action against him . . . and also because the company re-employed [the cab driver] after he had been released from prison." *Id.* at 552. The court firmly rejected this argument: "That these facts did not constitute a ratification of the crime which [the cab driver] committed is so obvious that the argument does not merit serious consideration." *Id.* Given the Pennsylvania Supreme Court's complete dismissal of a similar ratification argument in *Potter*, the lack of other case law supporting Doe's argument, and the fact that Sandusky's actions were not done on PSU's account, Doe's ratification claim must fail.

    In sum, Doe's Complaint does not state a claim for vicarious liability under Pennsylvania law, because it does not plausibly claim that Sandusky acted within the scope of his employment when he sexually abused Doe. I will therefore grant PSU's motion to dismiss Doe's vicarious liability claims.

---

[10] A company attorney who later attended the meeting advised that the pipes should be returned.

### B. Civil Conspiracy Claim

PSU claims that Doe also fails to state a claim for civil conspiracy. I will deny PSU's motion to dismiss this claim without prejudice to raise the issue at a later stage of the litigation. Doe has alleged sufficient factual content to state a plausible claim for civil conspiracy.

### IV. CONCLUSION

For the reasons set forth above, I will grant PSU's motion to dismiss Doe's vicarious liability claim (Count I) and deny PSU's motion to dismiss Doe's civil conspiracy claim (Count VI).

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to: